**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Gerald A. Gross**
**Rebecca Reilly**
**Jacob David Zetlin-Jones**
**Michael S. DiBattista**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0978 (Zetlin-Jones)**
**zetlinjonesj@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                               **Plaintiff,**<br><br>          **-against-**<br><br>**OLAYINKA TEMITOPE OYEBOLA AND OLAYINKA OYEBOLA & CO. (CHARTERED ACCOUNTANTS),**<br><br>                               **Defendants.** | **COMPLAINT**<br><br>**24 Civ. 7363 (     )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Olayinka Temitope Oyebola ("Oyebola") and Olayinka Oyebola & Co. (Chartered Accountants) ("Oyebola & Co." or the "Firm") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1.      The Commission brings this action against licensed accountant, Olayinka Oyebola, and his Public Company Accounting Oversight Board ("PCAOB")-registered public accounting firm, Oyebola & Co., for their roles in enabling and concealing a massive, multi-year fraudulent

scheme in wholesale abdication of their professional obligations as independent public accountants and financial industry gatekeepers.

2.    The scheme, orchestrated by Mmobuosi Odogwu Banye, a/k/a Dozy Mmobuosi ("Mmobuosi") and perpetrated through three related U.S. companies he controlled, Tingo International Holdings, Inc. ("Tingo International"), Agri-Fintech Holdings, Inc. ("Agri-Fintech") (listed OTC), and Tingo Group, Inc. ("Tingo Group") (previously traded on Nasdaq and now listed OTC) (collectively the "Tingo Entities"), involved recording billions of dollars' worth of fabricated transactions, non-existent assets and revenues, and fake cash balances on the books of Tingo Mobile Limited ("Tingo Mobile"), at all relevant times the primary operating subsidiary of each of the Tingo Entities.  As a result of the fraudulent scheme, each of the Tingo Entities massively overstated its revenues, income, and assets in its filings with the Commission and other public financial disclosures, creating the illusion that these were successful and lucrative businesses when, in fact, their operations and results were virtually entirely fabricated. Mmobuosi and the Tingo Entities persisted in their fraud until the Commission brought an emergency action to bring it to a halt in December 2023. See *SEC v. Mmobuosi, et al.*, No. 23-cv-10928 (JMF) (S.D.N.Y. Dec. 18, 2023) (the "Tingo Enforcement Action").

3.    Oyebola's Firm served as Tingo Mobile's external auditor for nearly the entirety of the fraud's duration. For three consecutive years, from fiscal years 2019 through 2021, Defendants issued clean, unmodified opinions signed by Oyebola attesting to the fair presentation of Tingo Mobile's manifestly inaccurate financial statements—despite the identification of numerous and glaring weaknesses in Tingo Mobile's internal controls. These fraudulent financial statements— carrying Oyebola's name and his Firm's certification—in turn infected the financial statements of Tingo Mobile's U.S. parent companies, misleading investors and other third parties who relied upon them.

4.      Defendants, however, lent more than merely their imprimatur to Tingo Mobile's fraudulent financial statements; they joined with and lent their affirmative aid to Mmobuosi and the Tingo Entities' broader scheme. Oyebola and his Firm knowingly or recklessly provided substantial assistance to the fraud in at least two respects.

5.      First, beginning at least as of 2020, while serving as auditor to both Tingo Mobile and Tingo International, Defendants discovered that Mmobuosi and other Tingo Mobile officials had on multiple occasions created and disseminated fraudulent audit reports on the Firm's letterhead bearing forgeries of Oyebola's signature. These ostensive audit reports certified that Defendants had conducted audits using procedures they never performed, under standards they never applied, and contained opinions as to the fair presentation of the financial statements that they never rendered. Oyebola immediately recognized the audit reports as forgeries.

6.      In contravention of their duties as a registered public accounting firm and a licensed independent public accountant associated therewith, however, neither the Firm nor Oyebola took any meaningful or appropriate action to report the fraud or otherwise address it. Nor did they take any steps to ensure the fake reports' retractions. To the contrary, Oyebola actively concealed the reports' fraudulent nature from independent members of Tingo International management, and he and his Firm deliberately remained silent as Mmobuosi and the Tingo Entities continued to create and use additional forged audit reports putatively from Oyebola and his Firm in subsequent public filings.

7.      Second, in August 2023, Oyebola intentionally misled the Israeli-based auditor ("Auditor A") of Tingo Group, Tingo Mobile's then-parent public company. At the time, in the aftermath of a highly-publicized analyst report casting doubt on the legitimacy of Tingo Group's financials and operations, Auditor A was seeking additional audit evidence to independently verify

certain of Tingo Mobile's reported transactions as it evaluated whether it could continue to serve as Tingo Group's auditor and whether to accept representations from Tingo Group management.

8.      On August 30, 2023, Tingo Mobile's CFO provided Oyebola bank records purporting to reflect payments by Tingo Mobile for certain of the transactions at issue. Mmobuosi directed Oyebola to send these wire transfer records to Auditor A, and to misrepresent to Auditor A that the records had been obtained from the bank directly, rather than from company management. Mmobuosi instructed Oyebola to leave "no trace of [us] sending to you, from you straight to [Auditor A]." As instructed, Oyebola caused a letter to be sent to Auditor A enclosing these bank records and falsely certifying that they were collected directly from the bank.

9.      As a result of Oyebola's knowing misrepresentation as to the provenance of these records, Auditor A accepted the bank records as authentic and corroborative of the transactions in question. In reality, the records were falsified. Oyebola's affirmative deception of Auditor A prevented Auditor A from discovering that the records were forged and that the transactions they purported to depict were fictitious. Relying, at least in part, on Oyebola's false representation, Auditor A ultimately determined it could continue its association with Tingo Group and signed off on materially inflated interim financial statements contained in Tingo Group's public filings for the following two quarters—allowing Tingo Group to sustain and prolong its fraud.

## VIOLATIONS

10.      By virtue of the foregoing conduct and as alleged further herein: (a) Defendants Oyebola and Oyebola & Co. have aided and abetted Mmobuosi's and the Tingo Entities' violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [15 C.F.R. §§ 240.10b-5]; and (b) Defendant Oyebola has aided and abetted Mmobuosi's violations of Exchange Act Rules 13b2-2(a) and (b) [240.13b2-2(a) and (b)].

11.    Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.    The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

13.    The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) permanently enjoining Oyebola from violating Exchange Act Rules 13b2-2(a) and (b) [17 C.F.R. §§ 240.13b2-2(a) and (b)]; (c) permanently prohibiting Defendants from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit; (d) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

15.    Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, during the relevant period, Agri-Fintech's common stock was quoted on OTC Link, operated by OTC Markets Group, and Tingo Group's stock was publicly traded on the Nasdaq stock exchange, both of which are in the Southern District of New York; forged audit reports were submitted to a major U.S. stock exchange based in this District (defined below as Exchange A); Agri-Fintech was headquartered in this District; and the closing of the merger between Agri-Fintech and Tingo Group occurred within this district.

## DEFENDANTS

17.     **Oyebola & Co.** (or the "Firm") is a Nigerian corporation co-founded by Oyebola in 2013 and based in Lagos, Nigeria, with branch offices in Houston, Texas, and Ontario, Canada. The Firm is controlled by its Managing Partner and CEO, Oyebola. The Firm provides professional auditing and accounting services. The Firm has been a PCAOB-registered accounting company since March 18, 2014, and it specializes in auditing SEC-registered issuers, with most of its clients listed on U.S. exchanges. The Firm markets itself as a "multi-disciplinary firm of professionals licensed and approved" by various governing bodies, including the Institute of Chartered Accountants of Nigeria, the Commission, the PCAOB, and the Canadian Public Accountability Board. The Firm is a subsidiary of a parent holding company, Olayinka Oyebola & Co., which also owns an affiliate, OO and Co. Consult, a consulting and tax advisory company, also owned by Oyebola. The Firm was censured by the PCAOB in November 2023 for failure to file Form APs in violation of PCAOB Rule 3211.

18.     **Oyebola**, 56, is a resident of Nigeria. Oyebola is the Managing Partner and CEO of the Firm, and he is an accountant licensed by the Institute of Chartered Accountants of Nigeria.

6

Oyebola has been the engagement partner for every PCAOB audit conducted by the Firm since at least 2020 (approximately 139 audits). Before co-founding the Firm, Oyebola worked for a decade in Nigeria as an accountant at a large, multinational accounting and consulting firm.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES[1]

19.     **Tingo Mobile** is a Nigerian corporation founded by Mmobuosi in 2001. Tingo Mobile purports to lease mobile phones to farmers—through agreements with cooperative associations in Nigeria and Ghana—and provide the farmers with access to mobile airtime, data services, and a proprietary platform to sell their crops, pay bills, and acquire insurance and loans, among other things. In 2020, Tingo Mobile became a wholly owned subsidiary of Tingo International through a share exchange. In August 2021, Tingo International sold Tingo Mobile to Agri-Fintech (then named Tingo, Inc.). In December 2022, Agri-Fintech sold Tingo Mobile to Tingo Group (then named MICT, Inc.).

20.     **Tingo International** is a Delaware corporation with its principal place of business in Stamford, Connecticut. Tingo International was incorporated in January 2020 to serve as a U.S. holding company for Tingo Mobile. Since its founding, Mmobuosi has served as Tingo International's CEO. Tingo International owned Tingo Mobile until it sold Tingo Mobile to Agri-Fintech (then named Tingo Inc.) in August 2021.

21.     **Agri-Fintech** is a Nevada corporation with its principal place of business in Draper, Utah. Agri-Fintech was originally incorporated in 2015 under the name iWeb. In August 2021, iWeb acquired Tingo Mobile from Tingo International, changed its name to Tingo Inc., and named Mmobuosi its CEO. On December 1, 2022, Tingo Inc. sold Tingo Mobile to Tingo Group (then

---

[1] For ease of reference, enclosed as Appendix A is a chart depicting an overview of the changes in Tingo Mobile and the Tingo Entities' corporate structures, parentage, and external auditors through August 2024.

named MICT, Inc.), in exchange for common and preferred stock of Tingo Group equal to 75% of the common stock of Tingo Group on a fully converted basis. On April 27, 2023, Tingo Inc. changed its name to Agri-Fintech. The company's shares have traded on OTC Link since 2016, originally under the symbol IWEBB and, as of 2022, under the symbol TMNA. Agri-Fintech's common stock has been registered with the Commission pursuant to Section 12(g) of the Exchange Act since September 2015. Until August 2024, Mmobuosi was Agri-Fintech's largest shareholder, directly or indirectly controlling 77.2% of its stock. On August 28, 2024, the United States District Court for the Southern District of New York entered a Final Judgment in the Tingo Enforcement Action, which resulted in the cancellation of Mmobuosi and Tingo International's shares of Agri-Fintech.

22.    **Tingo Group** is a Delaware corporation with its principal place of business in Montvale, New Jersey. Tingo Group was originally incorporated in 2002 under a different name. In 2018, it changed its name to MICT. On December 1, 2022, MICT acquired Tingo Mobile from Agri-Fintech (then named Tingo Inc.). In February 2023, MICT changed its name to Tingo Group. The company's shares traded on the Nasdaq Capital Market between 2013 and February 2024, originally under the symbol MICT and later TIO. In March 2024, Tingo Group's stock was delisted from Nasdaq and it now trades on OTC Link under the symbol TIOG. Tingo Group's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Until August 2024, Agri-Fintech was Tingo Group's largest shareholder through its ownership of 31.56% of Tingo Group's common stock, as well as Series B Preferred stock that is convertible to common stock which would bring Agri-Fintech's ownership to 75% of the common stock. On August 28, 2024, the United States District Court for the Southern District of New York entered a Final Judgment in the Tingo Enforcement Action, which resulted in the cancellation of Mmobuosi and Agri-Fintech's shares of Tingo Group stock.

23.     **Mmobuosi**, 45, is a Nigerian citizen who previously resided in the United Kingdom and is currently residing in Nigeria. Mmobuosi purportedly co-founded Tingo Mobile in 2001; founded Tingo International in 2020 and serves as its CEO; was appointed CEO of Agri-Fintech in 2021 upon Tingo International's sale of Tingo Mobile to Agri-Fintech; was appointed CEO of Tingo Group Holdings, LLC, a subsidiary of Tingo Group and parent of Tingo Mobile, on December 1, 2022, upon Agri-Fintech's sale of Tingo Mobile to Tingo Group; and was appointed co-CEO of Tingo Group in September 2023 until he resigned in December 2023.  Mmobuosi is the controlling shareholder of Tingo International (77%), and was, until August 28, 2024, the controlling shareholder of Agri-Fintech (77.2%) and the largest shareholder of Tingo Group. On August 28, 2024, the United States District Court for the Southern District of New York entered a Final Judgment the Tingo Enforcement Action, which resulted in the cancellation of Mmobuosi's shares of Agri-Fintech and Tingo Group stock. On January 2, 2024, the United States Attorney's Office for the Southern District of New York unsealed a criminal indictment against Mmobuosi related to the same underlying conduct as the Tingo Enforcement Action. Mmobuosi fled arrest in the United Kingdom and is currently a fugitive in Nigeria.

## FACTS

## I.     DEFENDANTS CERTIFY TINGO MOBILE'S FRAUDULENT FINANCIAL STATEMENTS.

### A.     Mmobuosi Falsifies Tingo Mobile's Financial Statements.

24.     Tingo Mobile has purported to be in the business of leasing mobile phones to farmers through agreements with farming cooperative associations in Nigeria and Ghana. It has claimed to earn income from leasing hardware (i.e., mobile handsets) to farmers, by providing farmers airtime and data services, and through farmers' usage on its handsets of Tingo Mobile's pre-installed, proprietary "Nwassa" platform, which purportedly facilitates farmers' crop sales, pricing and bill payments, among other things, across the African farming ecosystem.

25.     By 2019, Tingo Mobile claimed to have contracted with at least two farming

cooperatives in Nigeria and to have a subscriber base for its phone leasing contracts and Nwassa

software platform of over nine million farmers. It claimed to have earned hundreds of millions of

dollars from these contracts on an annual basis.

26.     But Tingo Mobile's business was a fiction. Its purported assets, revenues, expenses,

customers, and suppliers were virtually entirely fabricated.

27.     Beginning at least as of 2019, Mmobuosi—with the assistance of others, including

Tingo Mobile's CFO—caused the creation of fake financial statements and forged supporting

material to falsely portray Tingo Mobile as a thriving and profitable enterprise, with hundreds of

millions of dollars in annual revenues, profits, and available cash and a subscriber base of millions of

farmers using its phones and services.  In reality, the company had no meaningful operations or

customers and, as of the end of 2019, about $15 in its bank account.

**B.      Defendants Certify Tingo Mobile's Fraudulent Financial Statements Despite
         Numerous Identified and Unaddressed Weaknesses in Tingo Mobile's
         Internal Controls.**

28.     From fiscal years 2019 through 2021, the Firm served as Tingo Mobile's external

auditor, engaged to conduct annual audits of Tingo Mobile's financial statements for those fiscal

years, to be performed pursuant to International Standards for Accounting ("ISA").

29.     Oyebola was the Firm's lead engagement partner on each audit engagement.

30.     In connection with their audit work for Tingo Mobile, in each of these fiscal years,

Defendants identified numerous weaknesses in Tingo Mobile's internal controls and operations,

which were memorialized in management letters the Firm sent to Mmobuosi and Tingo Mobile.

31.     The Firm's fiscal year 2019 Management Letter, dated March 10, 2020, observed,

among other things, that (a) Tingo Mobile lacked a separate unit to handle its internal audit function

and, thus, that there was "no internal independent check on all company transactions," which left

Tingo Mobile "exposed to high business and operational, and compliance risk"; (b) Tingo Mobile's Board of Directors "did not meet in time to discuss pertinent issues" and "did not exercise its responsibility of [m]anaging the affairs of the company; and (c) Tingo Mobile failed to prepare bank reconciliation statements, which meant that "the accountant or the company's account officer in the bank cannot reasonably ascertain the real bank balance at a particular period."

32.     The Firm's fiscal years 2020 and 2021 Management Letters highlighted many of the same weaknesses—including the lack of a separate internal audit function and deficient Board oversight of company operations—an acknowledgment that these deficiencies remained unaddressed.  These and other weaknesses identified in the fiscal years 2019, 2020, and 2021 Management Letters concerning Tingo Mobile's internal controls and operations caused Oyebola and the Firm to have heightened concerns about the risk profile of Tingo Mobile.

33.     Notwithstanding these identified weaknesses and elevated risk profile, Oyebola and his Firm issued unmodified opinions attesting that Tingo Mobile's financial statements "g[a]ve a true and fair view of the company … and the financial performance and cash flows of the Company" for each fiscal year from 2019 through 2021.

34.     They did not.  The Tingo Mobile financial statements that Defendants certified reported hundreds of millions of dollars in revenues, income and cash balances that did not exist.

35.     As just one example, Tingo Mobile's fiscal year 2019 financial statements audited and certified by Defendants represented among other things, that Tingo Mobile possessed more than 68 billion Naira ($201 million USD) in cash and cash equivalents as of the end of the fiscal year and had earned more than 163 billion Naira ($489 million USD) in income and close to 50 billion Naira ($150 million USD) in gross profit for the year.

36.     In reality, Tingo Mobile's bank accounts held only 5,554.39 Naira at the end of fiscal year 2019—equivalent to $16.63 USD.  The income, profit, and other financial metrics reported in

Tingo Mobile's 2019 financial statements for which Oyebola and the Firm issued an audit report containing an unmodified audit opinion were similarly materially overstated. The same is true for the Tingo Mobile financial statements audited and certified by Defendants for fiscal years 2020 and 2021.

## II.    DEFENDANTS CONCEAL AND ACQUIESCE TO MMOBUOSI'S CREATION AND USE OF FALSIFIED AUDIT REPORTS.

### A.    Defendants Are Engaged to Audit Tingo International and Discover Management's Use of Fraudulent Audit Reports.

37.    Having procured audited financial statements attesting to the legitimacy of the Tingo Mobile's fabricated business model, Mmobuosi sought to capitalize on his fraudulent scheme by positioning his sham private company for public listing on the U.S. capital markets, ultimately merging the company into (and assuming control of) two publicly-traded U.S. entities, and reporting out massively inflated and ever increasing fictitious revenues and profits to lure investor demand and prop up the price of his companies' stock.

38.    In January 2020, Mmobuosi created Tingo International, a Delaware corporation, to serve as Tingo Mobile's U.S. holding company, and undertook a share exchange, effective February 2020, through which Tingo International became Tingo Mobile's sole shareholder.

39.    From January 2020 through August 2021, Tingo Mobile was Tingo International's sole asset and operating subsidiary, and its fraudulent financial statements were consolidated into Tingo International's financial statements.

40.    In or around September 2020, Mmobuosi took critical steps to achieve a direct listing for Tingo International on a major U.S. stock exchange ("Exchange A") and registration of Tingo International's shares with the Commission.

41.    Specifically, Mmobuosi caused Tingo International to submit a listing application with Exchange A in September 2020, and in connection with that application—as it announced in a

November 9, 2020 press release—confidentially submitted a draft Form S-1 with the SEC. Its press release stated that Tingo International's "public listing is expected to take place after the SEC completes its review process, subject to market and other conditions."

42.     As discussed below, in the course of preparing for this direct listing and shares registration, Mmobuosi and Tingo Mobile's CFO took various steps to conceal the fraudulent nature of Tingo Mobile's business from independent members of Tingo International management and Tingo International's Board of Directors—including sending them false financial statements and forged bank statements and restricting their access to information and data necessary for basic corporate oversight functions.  Mmobuosi and Tingo Mobile's CFO accomplished this with Defendant's substantial assistance.

43.     Oyebola and his Firm were engaged by Tingo International to conduct a "review" of Tingo International's financial statements for the first half of fiscal year 2020 (the period January 10 through June 30, 2020) in approximately September 2020. Oyebola and his Firm were directed by Tingo International to conduct their review in accordance with PCAOB standards and to opine on the fair presentation of the financial statements in accordance with U.S. generally accepted accounting principles.

44.     Oyebola understood that the purpose of his engagement was, at least in part, to assist Tingo International in its efforts to meet the requirements necessary to go public in the United States and list its stock on a U.S.-based exchange. The Tingo International Board of Directors resolution approving the engagement of Oyebola and his Firm appointed them to "prepare the necessary financial statements of the corporation and its subsidiary, Tingo Mobile PLC, for filing with the U.S. Securities and Exchange Commission a Registration Statement of the corporation on Form S-1 for a direct listing on [Exchange A] of shares of the corporation's Class A common stock."

45.     As a PCAOB-registered auditor, and as an independent public accountant associated with such an auditor familiar with registration and listing requirements applicable to U.S. issuers, the Firm and Oyebola knew that a PCAOB audit was required to meet U.S. registration and listing standards, and that they would be required to consent to the use of the audited statements in any offering documents.

46.     Oyebola and his Firm never completed this review because they were purportedly unable to obtain independent confirmation of Tingo International's bank account balances, and thus were unable to determine the accuracy of Tingo International's financial statements.

47.     However, at some point between October 2020 and December 2020, Oyebola and his Firm learned that Mmobuosi had caused Tingo International to create an October 22, 2020 "Report of Independent Registered Public Accounting Firm" on the Firm's letterhead and bearing Oyebola's signature (the "Forged Tingo International Audit Report").

48.     The Forged Tingo International Audit Report stated that the Firm had conducted and completed an audit of Tingo International under PCAOB standards, and it contained an opinion from the Firm that Tingo International's "financial statements present fairly, in all material respects, the financial position of the Company as of June 30, 2020, and the results of its operations and its cash flows for the period ended June 30, 2020, in conformity with U.S. generally accepted accounting principles."

49.     Neither Oyebola nor his Firm had completed an audit of Tingo International's financial statements or had reached any conclusion as to the fairness of their presentation. Nor had Oyebola or his Firm prepared, signed, or authorized the issuance of any such report.

50.     At or around the same time, Oyebola and the Firm learned that Mmobuosi had caused Tingo International to create a similar October 22, 2020 "Report of Independent Registered Public Accounting Firm" on the Firm's letterhead and bearing Oyebola's signature, which stated that

the Firm had conducted and completed audits of Tingo Mobile under PCAOB standards for fiscal years 2018 and 2019 ("Forged Tingo Mobile Audit Report").

51.     Like the Forged Tingo International Audit Report, the Forged Tingo Mobile Audit Report concluded that Tingo Mobile's "financial statements . . . present fairly, in all material respects, the financial position of the Company as at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America."

52.     Neither Oyebola nor his Firm had completed an audit of Tingo Mobile's financial statements under PCAOB standards or in conformity with U.S. generally accepted accounting principles. Nor had Oyebola or his Firm prepared, signed, or authorized the issuance of any such report. Oyebola and his Firm had only audited Tingo Mobile's financial statements for 2019, and only under International Standards for Accounting, not PCAOB, standards. Neither Oyebola nor his Firm had completed any audit, under any standard, for Tingo Mobile's financial statements for fiscal year 2018.

53.     As a result, Oyebola knew that these two audit reports were fake and that his signatures affixed to them were forged.

54.     Documents produced to the Commission by various individuals and entities in the course of the investigation show that Tingo International included these forged audit reports in a confidential draft Form S-1 it submitted to the Commission, as well as in a listing application it submitted to Exchange A.

55.     Oyebola was aware that Tingo International had submitted these forged audit reports to the Commission and Exchange A. Contemporaneous correspondence produced by the Firm and Oyebola's testimony demonstrate that Oyebola and his Firm provided assistance to Tingo International in preparing the draft Form S-1 and listing application.  In the course of this work,

Oyebola specifically discussed the Forged Tingo International Audit Report and the Forged Tingo Mobile Audit Report putatively signed by Oyebola and issued by his Firm with Tingo International management.

56.     Oyebola confronted Mmobuosi and Tingo Mobile's CFO by phone upon his discovery of the forged audit reports. He told them that the creation and use of forged audit reports bearing his signature and his Firm's name would jeopardize Oyebola's and his Firm's ability to continue to work for Tingo Mobile and the Tingo Entities.

57.     Despite this admonition, Oyebola and his Firm continued to perform audit and other accounting-related work for Tingo Mobile and the Tingo Entities for at least the next three years.

58.     As a PCAOB-registered accounting and auditing firm and a licensed independent public accountant associated with such a firm engaged to conduct a review of Tingo International's financial statements under PCAOB Auditing Standards ("AS"), the Firm and Oyebola had duties to follow those standards.

59.     Under AS 1001 ("Responsibilities and Functions of the Independent Auditor"), an auditor has a responsibility to "obtain reasonable assurances about whether the financial statements are free of material misstatement, whether caused by error or fraud," and to "state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles" through a report of independent auditor.

60.     Under AS 1015 ("Due Professional Care in the Performance of Work"), an auditor is required to "work with due professional care" and act in "good faith and with integrity."

61.     Under AS 2401 ("Consideration of Fraud in a Financial Statement Audit"), an auditor who finds evidence of fraud must bring the matter to the attention of an appropriate level of

management in a timely manner, including (where the fraud involves senior management), to the company's Audit Committee.

62.     Under AS 2405 ("Illegal Acts by Clients"), an auditor must adequately inform the Audit Committee of illegal acts that come to its attention "as soon as practicable," and may need to withdraw "when the client does not take the remedial action that the auditor considers necessary in the circumstances."

63.     Under AS 3320 ("Association with Financial Statements"), an auditor must ensure there is a "clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking" to prevent "misinterpretation of the degree of responsibility the accountant assumes when his name is associated with financial statements."  In addition, under this Auditing Standard, if an accountant's name is associated with financial statements that the accountant has not audited or reviewed, the accountant must issue a disclaimer stating that the financial statements were not audited by the accountant, and that the accountant does not express any opinion on the financial statements.

64.     Neither Oyebola nor his Firm reported the forgeries to the SEC.

65.     Neither Oyebola nor his Firm reported the forgeries to Exchange A.

66.     Neither Oyebola nor his Firm reported the forgeries to Tingo International or Tingo Mobile's other management members, Boards of Directors, or their Audit Committees.

67.     Neither Oyebola nor his Firm issued any disclaimers stating that the forged financial statements were not audited by Oyebola or his Firm, or that Oyebola and his Firm do not express any opinion on the forged financial statements.

**B.     Defendants Conceal the Forgeries from Tingo International Management.**

68.     In February 2021, Tingo International engaged Oyebola to conduct an audit of Tingo International's financial statements for the full year of fiscal year 2020, despite Oyebola and

his Firm's inability to complete the half-year review a few months earlier. Like the half-year review, this audit was also to be performed in accordance with PCAOB standards. Also like the half-year review, Defendants never completed this engagement, ostensibly because they were not able to obtain sufficient audit evidence to verify Tingo International's bank balances.

69.     Under the terms of the engagement letter retaining the Firm as Tingo International's external auditor, executed in March 2021, Oyebola and his Firm agreed to perform an audit of Tingo International's full year 2020 financial statements prepared under U.S. generally accepted accounting principles and in accordance with PCAOB standards.

70.     In connection with scoping the engagement and preparing the audit procedures for the Firm's audit of Tingo International's full-year 2020 financial statements, Tingo International's newly-installed Chief Financial Officer ("Tingo International's CFO"), who joined Tingo International in early 2021 (after Mmobuosi caused Tingo International to create the forged audit reports), asked Oyebola and his Firm a series of questions regarding their prior work on Tingo International's behalf.

71.     On or around May 24, 2021, after Defendants had begun their audit procedures for their full-year audit engagement, Tingo International's CFO emailed Oyebola and his Firm requesting that they provide the workpapers and other supporting documents underlying the Forged Tingo International Audit Report purportedly issued by the Firm and signed by Oyebola.

72.     Although Oyebola knew that that audit report (and his signature on it) were forged, and thus that there were no bona fide supporting documents underlying it, Oyebola concealed that fact from Tingo International's CFO.

73.     Instead, Oyebola implied the authenticity of the report and the existence of materials substantiating it by telling Tingo International's CFO that the evidence requested "has been shared

with the management" (i.e., Mmobuosi and Tingo Mobile's CFO) and directing Tingo International's CFO to obtain the materials from them.

74.    Tingo International's CFO responded three days later by email that "I have requested this information from management … and [Mmobuosi] referred me to you – please can you share this info."  In the same email, Tingo International's CFO also asked Oyebola to "advise where you get the underlying information that enabled your firm to prepare the 30 June 2020 financials."

75.    Oyebola ignored Tingo International's CFO's requests and never responded.

76.    Oyebola and his Firm never completed the full-year 2020 audit on behalf of Tingo International and never issued an audit report as to Tingo International's financial statements for fiscal year 2020.

77.    Ultimately, Tingo International abandoned its efforts to register and list its shares directly in the United States.  Its shares were never registered, and its listing application was never granted.

**C.    Defendants Continue to Issue Clean Audit Reports for Tingo Mobile After Mmobuosi Takes Tingo Public.**

78.    In August 2021, after Tingo International abandoned its efforts to obtain a direct listing, Tingo Mobile became a public company through a "reverse merger" when iWeb, Inc., a public company, issued 928 million shares of its Series A common stock and 65 million shares of its Series B common stock to acquire all the issued and outstanding common stock of Tingo Mobile from Tingo International.  The merged company renamed itself Tingo, Inc.—later renamed Agri-Fintech—and made Mmobuosi its CEO. Its common stock trades on OTC Link under the symbol TMNA.

79.    The merger assigned Tingo Mobile a purported valuation of billions of dollars, a valuation supported purely by the fabricated financial statements Mmobuosi concocted and the

phony operational successes they purported to depict, which materially misstated financial statements Defendants blessed or helped conceal.

80.    Through the reverse merger, Tingo Mobile became Agri-Fintech's primary asset and operating subsidiary.  Following the reverse merger, Agri-Fintech's books and records and public filings incorporated the fictitious transactions, operations, and financial results of Tingo Mobile.  As a result, Agri-Fintech's publicly-filed financial statements were fraudulently and materially overstated during the period in which Agri-Fintech owned Tingo Mobile.

81.    For example, from August 2021 through December 2022, Agri-Fintech's publicly-filed financial statements contained in its quarterly and annual reports disclosed to investors that Agri-Fintech maintained cash and cash equivalent balances ranging from approximately $25 million to approximately $313 million, based almost entirely on the account balances reflected in Tingo Mobile's forged and fabricated bank statements.  Tingo Mobile's actual bank balances during this time ranged from less than $20 to, at most, approximately $33,000.

82.    Agri-Fintech's reported revenues, expenses and income were similarly inflated as a result of their incorporation of Tingo Mobile's fraudulent financial statements and results.

83.    Although a different, U.S.-based auditing firm audited Agri-Fintech's financial statements, Oyebola and the Firm continued to perform the external audit function on behalf of Agri-Fintech's Tingo Mobile subsidiary during this period. In connection with this audit engagement, Oyebola and the Firm issued an audit report containing an unmodified audit opinion attesting to the fair presentation of Tingo Mobile's manifestly inaccurate financial statements for fiscal year 2021.

**D.    Defendants Acquiesce to Mmobuosi's Continued Use of Falsified Audit Reports.**

84.    On July 22, 2022, Agri-Fintech filed with the Commission an amendment to its Form 10-K for fiscal year 2021 ("2021 Form 10-K/A") to modify the accounting treatment of the merger through which Agri-Fintech acquired Tingo Mobile.

85.    The 2021 Form 10-K/A enclosed a "Report of Independent Registered Public Accounting Firm," dated July 19, 2022, on the Firm's letterhead and purporting to bear Oyebola's signature. This publicly-filed audit report stated that the Firm had conducted an audit of Tingo Mobile for fiscal year 2020 in accordance with PCAOB standards. The report concluded that "[i]n our opinion, the consolidated financial statements [of Tingo Mobile] present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles" (the "Second Forged Tingo Mobile Audit Report").

86.    Neither Oyebola nor his Firm had completed an audit of Tingo Mobile's financial statements under PCAOB standards or in conformity with U.S. generally accepted accounting principles for any fiscal year, including 2020. Nor had Oyebola or his Firm prepared or signed any such report or consented to its inclusion in the 2021 Form 10-K/A.

87.    Although the Firm had audited Tingo Mobile for its fiscal year 2020, it had done so under ISA standards, not, as the Second Forged Tingo Mobile Audit Report indicated, under PCAOB standards.

88.    Oyebola became aware of the filing of the Second Forged Tingo Mobile Audit Report shortly after it was filed through the Commission's EDGAR filing system, on which the 2021 Form 10-K/A was publicly available.

89.    Oyebola immediately recognized that the Second Forged Tingo Mobile Audit Report was a forgery.

90.     On July 26, 2022, Oyebola sent Mmobuosi a message via WhatsApp attaching a picture of the Second Forged Tingo Mobile Audit Report, and writing to Mmobuosi that his Firm's "Board" (which consisted of Oyebola and only one other Firm partner) "found out you guys have already file[d] a report I never signed on the 19th on SEC … please how do I convince them now to go on…"

91.     On or about the same day, Oyebola spoke with Mmobuosi by telephone. According to sworn testimony Oyebola provided during the Commission's investigation of this matter, Oyebola was "cross" with Mmobuosi during this conversation regarding Mmobuosi's use of the forged audit report, and threatened to report Mmobuosi and Agri-Fintech to the relevant authorities, including the SEC.

92.     Mmobuosi told Oyebola on this call that Agri-Fintech would remove the audit report from the Commission's EDGAR system and that Mmobuosi would hire a new auditor to actually conduct an audit of Tingo Mobile under PCAOB standards and apply U.S. generally accepted accounting principles. Mmobuosi assured Oyebola that the audit report issued by this new auditor would be made public and would inform third parties (including Agri-Fintech investors and the SEC) that the Second Forged Tingo Mobile Audit Report could not be relied upon.

93.     Despite their duties as independent public accountants (as described in paragraphs 58 to 63 above), neither Oyebola nor his Firm took any affirmative steps to report Mmobuosi's forgery beyond obtaining these assurances from Mmobuosi.

94.     Despite learning that Mmobuosi and Tingo Mobile had yet again manufactured a bogus audit report on his Firm's letterhead and publicly used a forgery of his signature, Oyebola did not resign as Tingo Mobile's auditor and, in fact, continued to perform audit and non-audit work for Tingo Mobile and Tingo Group for at least the following year.

95.    Although Oyebola testified that he threatened to report Mmobuosi and Agri-Fintech's conduct, neither Oyebola nor his Firm in fact reported Mmobuosi's use of the forged audit report to the Commission or any other regulatory authority.

96.    Neither Oyebola nor his Firm reported Mmobuosi's use of the forged report to Agri-Fintech's Board of Directors, its Audit Committee, or its U.S.-based external auditor.

97.    Oyebola and the Firm's failures to act in an appropriate manner upon learning of yet another fake audit report bearing the Firm's name and Oyebola's signature occurred even though Oyebola knew—as he testified under oath—that Mmobuosi's conduct was "not going to stop."

98.    Despite Mmobuosi's assurances, Agri-Fintech never removed the Second Forged Tingo Mobile Audit Report from Commission's EDGAR filing system. In fact, it is not possible for an issuer to remove a publicly-filed document from the Commission's EDGAR filing system. The Second Forged Tingo Mobile Audit Report remained publicly available, and no subsequent notice or disclosure was ever filed instructing third parties that the report could not be relied upon.

99.    As Oyebola predicted, Mmobuosi's misconduct did not stop.  Mmobuosi continued to fabricate and disclose fraudulent audit reports using Oyebola and his Firm's name on behalf of the Tingo Entities. Between September 2021 and February 2023, Agri-Fintech or Tingo Group filed five additional forged audit reports bearing the Firm's name with the Commission.

      a.    On September 13, 2021, Agri-Fintech filed a Form 8-K/A through the Commission's EDGAR filing system, which enclosed a purported September 8, 2021 audit report from the Firm which stated that the Firm had audited Tingo Mobile's financial statements under PCAOB standards for fiscal years 2019 and 2020 and opined that the financial statements were presented fairly in all material respects and in conformity with U.S. generally accepted accounting principles.

b.  On November 16, 2021, Agri-Fintech filed a Form 10-K/A for fiscal year 2020 through the Commission's EDGAR filing system, which enclosed a purported audit report from the Firm, signed by Oyebola, dated "November __, 2020," which stated that the Firm had audited Tingo Mobile's financial statements under PCAOB standards for fiscal year 2020 and opined that the financial statements were presented fairly in all material respects and in conformity with U.S. generally accepted accounting principles.

c.  On July 26, 2022, Tingo Group filed a Form S-4 Registration Statement through the Commission's EDGAR filing system, which enclosed a purported July 24, 2022 audit report and auditor consent from the Firm, signed by Oyebola, which stated that the Firm had audited Tingo Mobile's financial statements under PCAOB standards for fiscal year 2020 and opined that the financial statements were presented fairly in all material respects and in conformity with U.S. generally accepted accounting principles.

d.  On February 9, 2023, Tingo Group filed a Form 8K/A through the Commission's EDGAR filing system, which enclosed a purported February 8, 2023 audit report from the Firm, signed by Oyebola, which stated that the Firm had audited Tingo Mobile's financial statements under PCAOB standards for fiscal year 2020 and opined that the financial statements were presented fairly in all material respects and in conformity with U.S. generally accepted accounting principles.

e.  On February 15, 2023, Tingo Group filed a Preliminary Schedule 14A Proxy Statement through the Commission's EDGAR filing system, which enclosed a purported audit report from the Firm, signed by Oyebola, dated "November __,

2022," which stated that the Firm had audited Tingo Mobile's financial statements under PCAOB standards for fiscal year 2020 and opined that the financial statements were presented fairly in all material respects and in conformity with U.S. generally accepted accounting principles.

100.    All five of these audit reports filed by Agri-Fintech or Tingo Group were forged. Neither Oyebola nor his Firm had completed an audit of Tingo Mobile's financial statements for fiscal years 2019 or 2020 under PCAOB standards or in conformity with U.S. generally accepted accounting principles. Nor had Oyebola or his Firm prepared or signed any such reports or consented to their inclusion in the companies' filings.

101.    According to sworn testimony Oyebola provided during the Commission's investigation of this matter, during this period, Oyebola and the Firm continuously monitored filings made by the Firm's public issuer clients on the Commission's EDGAR filing system to ensure that filings referencing the Firm and its audit work are accurate and authorized. Oyebola testified that this control process existed and applied to comply with PCAOB Rule 3211, which requires PCAOB-registered auditors to timely file a Form AP with the PCAOB when an issuer files a report with the Commission that includes an audit report issued by a PCAOB-registered firm.

102.    Given Oyebola's acknowledged practice of reviewing and monitoring his client's EDGAR filings, Oyebola and his Firm knew of, or recklessly disregarded, the Tingo Entities' continued use of fabricated audit reports bearing forgeries of Oyebola's signature.

103.    Yet, in contravention of their duties as public company accountants (including the standards described in paragraphs 58 to 63, above), they failed to take any steps to mitigate this persistent fraudulent misconduct.

104.    Oyebola and the Firm never disclosed the use of these forgeries to regulatory authorities, or to the Tingo Entities' management, Boards of Directors, or Audit Committees or their external auditors.

105.    In addition, on one other occasion, on December 16, 2021, Oyebola messaged Mmobuosi via WhatsApp accusing him (albeit mistakenly) of filing still another forged audit report in his firm's name on behalf of Agri-Fintech. Before learning that his accusation was unfounded, Oyebola told Mmobuosi "ill let this pas[s] because of the love I have for you…"

## IV.   OYEBOLA INTENTIONALLY LIES TO TINGO GROUP'S AUDITOR TO PERPETUATE THE TINGO FRAUD.

106.    In December 2022, Agri-Fintech sold Tingo Mobile to MICT, a Nasdaq-listed financial technology company offering insurance brokerage platform services in China as well as stock trading and wealth management services in other parts of Asia. Under the merger agreement, MICT acquired 100% of Tingo Mobile from Agri-Fintech in exchange for 19.99% of MICT's common stock, plus preferred convertible shares that, upon conversion, would give Agri-Fintech ownership of 75% of MICT's outstanding common shares. Following the merger, MICT rebranded itself as Tingo Group, Inc., and traded on Nasdaq under the symbol "TIO" until it was delisted in March 2024.

107.    Tingo Group appointed Auditor A, an Israel-based auditor within the network of one of the world's largest accounting firms, to audit the financial statements of the newly-merged company and its operating subsidiaries, including Tingo Mobile.

108.    From December 2022 to present, Tingo Group's books and records and public filings have incorporated the fictitious transactions, operations, and financial results of Tingo Mobile, with Tingo Mobile's operations becoming Tingo Group's predominant operations.  As a result, as in the case of Agri-Fintech, following its December 2022 purchase of Tingo Mobile, Tingo

Group materially and fraudulently overstated its sales, earnings, and assets in its publicly-filed financial statements.

109.    For example, from December 2022 through November 2023, Tingo Group's publicly-filed financial statements reported to investors that it maintained cash balances ranging from approximately $53 million to over $500 million, based primarily on fabricated balances appearing in Tingo Mobile's forged bank statements. Authentic bank records obtained directly by the Commission from Tingo Mobile's bank show that Tingo Mobile's actual bank balances during this period ranged from less than $1 to approximately $6,000.

110.    Tingo Group's reported revenues, expenses and income were similarly inflated as a result of their incorporation of Tingo Mobile's fraudulent financial statements and results.

111.    On June 6, 2023 a financial research firm published a report (the "June 6 Analyst Report"), which accused the Tingo Group of being "an exceptionally obvious scam with completely fabricated financials."

112.    Among other things, the June 6 Analyst Report alleged that the significant cash balances Tingo Group claimed to hold at Nigerian banking institutions appeared to be fake.  The report also raised questions as to the veracity of Tingo Mobile's purported dealings with its customers and suppliers, suggesting that Tingo Mobile's reported business operations were fictitious.

113.    In response to the June 6 Analyst Report, Tingo Group's Audit Committee engaged independent counsel to review the allegations contained in the report.

114.    Auditor A relied, at least in part, upon this investigation—and the independence and competence of the lawyers conducting it—in its evaluation of whether to continue its association with Tingo Group as company auditors and whether to continue to accept representations from company management.

115.    On or about August 21, 2023, Auditor A presented to Tingo Group's Audit Committee to update the Committee on Auditor A's discussions with investigative counsel regarding the status of the Board-directed independent investigation into the allegations contained in the June 6 Analyst Report.

116.    Auditor A reported to the Audit Committee that, at that time, certain issues remained subject to further investigation, and that barring resolution of these open items, Auditor A would not be able or willing to complete its review of the company's consolidated financial statements for the period ended June 30, 2023.

117.    Specifically, before it would be willing to continue its association with Tingo Group as its external auditor, Auditor A required, among other things, independent corroboration that Tingo Group had satisfied its domestic tax obligations and that it had, in fact, made certain purchases from its supposed phone suppliers.

118.    As a result of Auditor A's unwillingness to provide its sign off on Tingo Group's interim consolidated financial statements, on August 21, 2023, Tingo Group announced the postponement of its quarterly earnings release and the filing of its Form 10-Q for the second quarter of 2023. In its press release disclosing the postponement, Tingo Group stated that due to the Audit Committee's ongoing work in investigating the allegations made in the June 6 Analyst Report, "the Company and the independent auditors require additional time to complete the preparation of the Form 10-Q and financial statements."

119.    On August 29, 2023, Tingo Mobile's CFO sent Oyebola an electronic message via WhatsApp, attaching seventeen (17) supposed bank wire transfer records.

120.    The bank records purported to demonstrate the transfer of tens of billions of Naira from Tingo Mobile's bank account to various individuals and entities, including Tingo Mobile's supposed suppliers and other third parties, and to Nigerian tax authorities.

121.    The records that Tingo Mobile's CFO provided to Oyebola were forged, and the
transactions they purported to reflect were fictitious. Authentic bank records produced to the SEC
staff directly by Tingo Mobile's bank demonstrate that the transfers reflected in the records Tingo
Mobile's CFO sent Oyebola never, in fact, occurred.

122.    Mmobuosi directed Oyebola to send these forged bank records to Tingo Group's
auditor, Auditor A, and to misrepresent that the records had come directly from the bank, and not
from Tingo Mobile management.

123.    On August 30, Mmobuosi messaged Oyebola that Auditor A "are waiting for your
mail … Please let there be no trace of [Tingo Mobile's CFO] sending to you, from you straight to
[Auditor A]."

124.    Mmobuosi instructed Oyebola to forward a copy of his correspondence with
Auditor A to a consultant for Tingo Group once completed. Oyebola replied that he would blind
copy Tingo Mobile's CFO on the email transmittal to Auditor A.

125.    The same day, an email address belonging to "ooandco consult" sent Auditor A, an
email attaching the forged bank records as well as a letter on OO and Co. Consult letterhead, which
stated: "We hereby certify that the attached … transfer advices regarding Tingo Mobile have been
collected Directly [sic] by us from [Tingo Mobile's bank]."

126.    The email and letter were signed by Individual A, who was identified in the letter as a
Director at OO & Co. Consult, and who is identified in other Oyebola & Co. documents as both an
"IT Audit Partner" and a "Manager" of the Firm.

127.    Though the email and letter were purportedly sent and signed by Individual A,
Oyebola at a minimum received a copy of the email: on August 30, 2023, Oyebola sent Mmobuosi
and Tingo Mobile's CFO messages over WhatsApp containing pictures of the email sent to Auditor

A by the "ooandco consult" email address to confirm that he had followed through on Mmobuosi's instruction.

128.     The same day, a consultant for Tingo Group (the same consultant Mmobuosi referenced in paragraph 124 above) emailed Auditor A stating: "You should by now hopefully have received the [National Electronic Funds Transfer] advices directly from Mr. Olayinka Oyebola, who is partner of PCAOB audit practice and accountants, Olayinka Oyebola & Co., which are tax adviser to Tingo Mobile and Tingo Foods.  He arranged the collection of the transfer advices directly from [the bank] this morning … and they should hopefully be with you by now; together with a letter confirming the statements were collected directly from the bank."

129.     The next day, August 31, 2023, Oyebola sent Mmobuosi and Tingo Mobile's CFO messages over WhatsApp to confirm that he was mailing a hard copy of the letter and wire transfer records to Auditor A (per Auditor A's request).

130.     Oyebola also sent Mmobuosi and Tingo Mobile's CFO a photo of the DHL shipping label addressed to Auditor A as confirmation that he had sent the forged bank records to Auditor A via hard copy, and Oyebola requested reimbursement for postage.

131.     As an independent public accountant associated with a PCAOB-registered auditor, Oyebola knew that receiving bank records directly from the third-party bank, and not relying solely on client-provided bank statements, was important to Auditor A's audit confirmation process. Oyebola knew and understood that obtaining this audit evidence independent from the client (Tingo Group) was a critical step in an auditor's assessment both of the bank balances and wire activities reported and of the authenticity of the supporting materials Tingo Group management supplied to support its financial statement assertions.  This was especially true in the enhanced audit environment following the June 6 Analyst Report concerning Tingo Group.

132.     Oyebola also understood that Tingo Mobile (and therefore Tingo Group) purported to carry inordinately large cash balances, and therefore that these bank records, and their authenticity, were material to Auditor A's evaluation of Tingo Group's consolidated financial statements. Oyebola acknowledged that he would not have been able to sign off on an audit for an issuer with such substantial cash balances without obtaining confirmation of the issuer's bank account balances directly from the bank.

133.     Notwithstanding his awareness of the importance to Auditor A that the records be received from an independent source, Oyebola falsely represented to Auditor A that he independently obtained the wire records directly from the bank when, in fact, he received them from Tingo Group management.

134.     By misrepresenting the source of the bank records in this way, Oyebola helped conceal from Auditor A that they were forgeries.

135.     Auditor A did in fact rely on this misrepresentation from Oyebola. Oyebola's false statement that the transmitted bank records were obtained directly from the bank confirmed for Auditor A the authenticity of the records and the corresponding transactions in Tingo Group's books and records as part of their review procedures, and was an important factor in Auditor A's determination to remain as the auditor for Tingo Group following the allegations publicized in the June 6 Analyst Report and to complete their review of Tingo Group's Form 10-Q for the second quarter of 2023.

136.     On August 30, 2023, Tingo Group announced the results of its investigation, reporting in a press release that the independent investigation had debunked the June 6 Analyst Report's allegations, and, among other things, had confirmed the accuracy of the company's bank account balances.

137.　　On August 31, 2023, relying, in part, on Oyebola's misrepresentation, Auditor A completed its review of Tingo Group's interim consolidated financial statements for the period ended June 30, 2023, and Tingo Group filed its Form 10-Q.

138.　　This quarterly report materially overstated Tingo Group's assets, revenues, and expenses: for example, the Company reported cash balances of over $50 million, most of which was purportedly held in Tingo Mobile's bank accounts—accounts which, at the time, held only approximately $100.

139.　　Thereafter, Mmobuosi and the Tingo Entities continued a series of public denials, insisting that Tingo Mobile's nonexistent businesses and fabricated revenues were legitimate. Mmobuosi and the Tingo Entities persisted in their false denials—and continued to prepare and file false financial statements in its periodic SEC filings, and publicly issue press releases attesting to the accuracy of Tingo Mobile's knowingly false financial results—even after the Commission temporarily suspended trading in Agri-Fintech and Tingo Group stock on November 14, 2023, citing "questions and concerns regarding the accuracy" of public information concerning the two entities.

## V.　　THE COMMISSION FILES THE TINGO ENFORCEMENT ACTION.

140.　　On December 18, 2023, the Commission filed the Tingo Enforcement Action against Mmobuosi and the Tingo Entities in the United States District Court for the Southern District of New York, alleging numerous primary and (as to Mmobuosi) secondary violations of the anti-fraud, record-keeping, and accounting controls provisions of the federal securities laws, among others. The same day, the Court granted a temporary restraining order (later converted to a preliminary injunction) and other equitable relief.

141.    Shortly after the Commission filed the Tingo Enforcement Action, Tingo Group filed a notice that the consolidated financial statements audited and/or reviewed by Auditor A "should no longer be relied upon."

142.    On January 2, 2024, the United States Attorney's Office for the Southern District of New York unsealed criminal charges against Mmobuosi arising out of certain of the conduct alleged in the Tingo Enforcement Action. Mmobuosi has not appeared in the parallel criminal action and remains a fugitive in Nigeria.

143.    On January 16, 2024, Auditor A resigned as Tingo Group's independent auditor.

144.    On August 28, 2024, after Mmobuosi and the Tingo Entities failed to appear, the Court entered a final judgment on default enjoining Mmobuosi and the Tingo Entities from violating the securities laws provisions they were alleged to have violated and imposing more than $250 million in combined disgorgement and civil money penalties against them, among other relief.

## FIRST CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Both Defendants)

145.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

146.    As alleged above, Mmobuosi and the Tingo Entities directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly,

or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

147.    By reason of the foregoing, Mmobuosi and the Tingo Entities violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

148.    Defendants knowingly or recklessly provided substantial assistance to Mmobuosi and the Tingo Entities with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

149.    By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Mmobuosi and the Tingo Entities' violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and, unless enjoined, Defendants will again aid and abet these violations.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(Both Defendants)**

150.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

151.    As alleged above, Mmobuosi and the Tingo Entities directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

152.    By reason of the foregoing, Mmobuosi and the Tingo Entities violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

153.    Defendants knowingly or recklessly provided substantial assistance to Mmobuosi and the Tingo Entities with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

154.    By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Mmobuosi and the Tingo Entities' violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Defendants will again aid and abet these violations.

### THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Rule 13b2-2(a)
### (Oyebola)

155.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 106 through 144.

156.    As alleged above, Mmobuosi, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with audits, reviews, or examinations of Tingo Group's financial statements or in the preparation or filing of Tingo Group's documents or reports required to be filed with the SEC; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with audits, reviews or examinations of financial statements or in the preparation or filing of Tingo Group's documents or reports required to be filed with the SEC.

157.    By reason of the foregoing, Mmobuosi violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

158.     Oyebola knowingly or recklessly provided substantial assistance to Mmobuosi with respect to his violations of Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

159.     By reason of the foregoing, Oyebola is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Mmobuosi's violations of Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] and, unless enjoined, Oyebola will again aid and abet these violations.

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Rule 13b2-2(b)**
**(Oyebola)**

160.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 106 through 144.

161.     As alleged above, Mmobuosi, directly or indirectly, took action to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of Tingo Group's audit or review of the financial statements of Tingo Group that are required to be filed with the SEC, and Mmobuosi knew or should have known that such action, if successful, could have resulted in rendering Tingo Group's financial statements materially misleading.

162.     By reason of the foregoing, Mmobuosi violated Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)].

163.     Oyebola knowingly or recklessly provided substantial assistance to Mmobuosi with respect to his violations of Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)].

164.     By reason of the foregoing, Oyebola is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Mmobuosi's violations of Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)] and, unless enjoined, Oyebola will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Oyebola and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) and Rules 10b-5 and 13b2-2(a) and (b) thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-2(a) and (b)];

**II.**

Permanently enjoining Oyebola & Co. and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

Permanently prohibiting Defendants from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit. For purposes of this paragraph: (1) "Accounting or financial reporting role" means participating in the preparation of financial statements; decisions about financial reporting; the creation or implementation of accounting policies; or decisions about accounting treatment, and (2) "Public company" means a company, foreign or domestic, that files financial statements with the Commission;

**IV.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15

U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
         September 30, 2024

                                        /s/ Antonia M. Apps
                                        ANTONIA M. APPS
                                        REGIONAL DIRECTOR
                                        Tejal D. Shah
                                        Gerald A. Gross
                                        Rebecca Reilly
                                        Jacob David Zetlin-Jones
                                        Michael S. DiBattista
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        New York Regional Office
                                        100 Pearl Street
                                        Suite 20-100
                                        New York, NY 10004-2616
                                        (212) 336-0978 (Zetlin-Jones)
                                        zetlinjonesj@sec.gov

**APPENDIX A**

| Before February 2020 | Feb. 2020 - Aug. 2021 | Aug. 2021 - Nov. 2022 | Nov. 2022 - Aug. 2024 |
|---|---|---|---|
| • **Tingo Mobile**<br>• Nigerian Co.<br>• Standalone Private Company<br>• 100% owned by Mmobuosi<br>• Audited by Oyebola & Co. | • **Tingo International**<br>• Private U.S. Holding Co.<br>• 100% owner of Tingo Mobile<br>• Audited by Oyebola & Co. (Audit Never Completed) | • **Agri-Fintech**<br>• Public U.S. Co.<br>• Trades OTC ("TMNA"")<br>• 100% owner of Tingo Mobile<br>• Parent Co. Audited by U.S. Auditor<br>• Tingo Mobile subsidiary audited by Oyebola & Co. | • **Tingo Group**<br>• Public U.S. Co.<br>• Traded on NASDAQ ("TIO") until March 2024.<br>• 100% owner of Tingo Mobile<br>• Previously named MICT, Inc.<br>• Parent Co. and Tingo Mobile subsidiary audited by Auditor A. |